UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| HAROLD McPHAIL, | ) | Civil Action No.: 4:11-cv-2417-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| SONOCO PRODUCTS COMPANY and | ) | |
| SONOCO PAPERBOARD GROUP, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

Plaintiff brings this action pursuant to the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601, et seq.  Presently before the Court is Defendants' Motion for Summary Judgment (Document # 43).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.    FACTS

Plaintiff worked for Defendant Sonoco Products Company[1] as a winder operator in its paper mill in Hartsville, South Carolina, from August 23, 2004, until his termination on September 18, 2009. Harris Aff. ¶ 3 (attached to Defendants' Motion as Exhibit A).  Plaintiff received generally good performance reviews for years 2004 and 2005.  Plaintiff Dep. 71-75. However, his review for

---

[1] Plaintiff only ever worked in Sonoco's paper mill in Hartsville, South Carolina.  Plaintiff Dep. 105-106. Defendant Sonoco Paperboard Group, LLC, is a subsidiary of Sonoco that operates two facilities – one in Pennsylvania and one in Georgia.  Harris Aff. ¶ 4. Plaintiff concedes that if Sonoco Paperboard's only locations are in Pennsylvania and Georgia, he never worked for that corporation.  Plaintiff Dep. 105-106.  Plaintiff does not address Defendants' argument that Sonoco Paperboard Group, LLC, is not a proper Defendant in this action, and thus appears to concede as much.  Accordingly, it is recommended that Sonoco Paperboard Group, LLC, be dismissed from this action.

year 2006 indicated that Plaintiff needed to improve his poor work quality and poor attendance. Plaintiff Dep. 75-77. He received this review on February 23, 2007, and so, at that time, knew his supervisor expected improvement. Id.

On October 18, 2007, Plaintiff received a written reprimand for excessive quality errors. Plaintiff Dep. 82-84. He realized that if he continued to have quality errors, he could be fired. Plaintiff Dep. 84. In his performance review for 2007, Plaintiff was rated below average in "quality of work" due to these quality errors. Plaintiff Dep. 77-78. He received another below average rating in "attitude in cooperation" because he got into a confrontation with another employee. Plaintiff Dep. 78-79. Also, Plaintiff 's supervisor reiterated that his poor attendance was unacceptable. Plaintiff Dep. 81. Plaintiff understood that his performance evaluations were becoming more and more negative, Plaintiff Dep. 81, and that Sonoco expected improvement from him. Plaintiff Dep. 82.

Despite his negative performance reviews for years 2006 and 2007, Plaintiff received five write-ups in 2008 and early 2009, which included a verbal reprimand on February 1, 2008, for quality errors, Plaintiff Dep. 85-86; a written reprimand on February 15, 2008, for quality errors, Plaintiff Dep. 86-87; a three-day disciplinary layoff on September 2, 2008, for quality errors, Plaintiff Dep. 87-88:25; a documented formal discussion on November 6, 2008, for not completing a required safety program, Plaintiff Dep. 89-91; and a three-day disciplinary layoff on January 8, 2009, for quality errors, Plaintiff Dep. 91-92.

From January 8, 2009 until August 18, 2009, Plaintiff was written up six more times, mostly for poor attendance but also for quality errors and using his cell phone inside the paper mill. Plaintiff

Dep. 92-97.[2]  Sonoco's attendance policy is a no-fault occurrence system.  Attendance Policy (attached to Defendants' Motion as Exhibit D).  Each time an employee is absent, tardy, or leaves work early counts as one occurrence under the policy.[3]  Attendance Policy; Plaintiff  Dep. 41. Accumulating nine occurrences in a rolling 12-month period may result in a disciplinary layoff. Attendance Policy.  Accumulating ten occurrences in a rolling 12-month period is grounds for termination.  Attendance Policy; Plaintiff Dep. 40-41.  Failing to call in before being absent or late is an unexcused absence. Attendance Policy.  Three unexcused absences in a rolling 12-month period is grounds for termination.  Attendance Policy.

On August 18, 2009, when his shift ended at 7:00 a.m., Plaintiff met with Greg McDonald, his direct shift supervisor, and Jeff Moffat, the mill superintendent, to discuss his employment, specifically his poor attendance and the fact that he felt he was being "harassed and bothered" by McDonald. Plaintiff  Dep. 51-55; 102-103.  During the meeting, Plaintiff  received a written reprimand explaining he had accumulated eight attendance occurrences over the last twelve months. Plaintiff  Dep. 54; 99.  Plaintiff informed McDonald and Moffatt that he was unaware of several of the attendance occurrences.  Plaintiff Dep. 99.  Plaintiff  did not show up for his scheduled shift at 11:00 p.m. later that night.  Plaintiff Dep. 58.  This absence was Plaintiff 's ninth occurrence under Sonoco's attendance policy. Id.  A dispute exists as to whether Plaintiff called in prior to missing work. Compare McDonald Dep. 20-21 (attached to Defendants' Motion as Exhibit E) with Plaintiff

_____

[2]While Plaintiff  asserts that he did not see the paperwork for these write-ups until after his termination, he admits that by August 18, 2009, he knew which attendance occurrences Sonoco was counting against him.  Plaintiff  Dep. 100.

[3]The following would not count as an occurrence: pre-scheduled vacation, prescheduled leaving early or arriving late, FMLA leave, layoff other than for a disciplinary reason, bereavement leave, jury duty, educational leave, or military leave. Attendance Policy.  Sonoco also would not count as an occurrence any absences that were covered by a doctor's excuse. Plaintiff  Dep. 46.

Dep. 44. Nevertheless, Plaintiff would have received an occurrence under Sonoco's policy either way because there was no doctor's excuse or any other documentation excusing his August 18 absence. Attendance Policy. Pursuant to Sonoco's attendance policy, this ninth occurrence resulted in a disciplinary layoff. Plaintiff Dep. 132-133. Plaintiff was informed of this layoff on August 27, 2012. Id.

At some point following the August 18 meeting, Plaintiff became ill.[4] Plaintiff Dep. 52. He visited Pee Dee Health Care on August 24, 2009, and received treatment from James N. Goodson III, a Nurse Practitioner. Goodson Dep. 12 (attached to Defendants' Motion as Exhibit F); Goodson Notes (attached to Defendants' Motion as Exhibit G). Plaintiff told Goodson that he ate a sub sandwich and, after doing so, had stomach issues including diarrhea and nausea. Plaintiff Dep. 26; Goodson Notes. Goodson diagnosed Plaintiff with gastroenteritis. Goodson Notes. Gastroenteritis is commonly known as the stomach bug or food poisoning. Goodson Dep. 17. Goodson prescribed Plaintiff with Levsin for cramps and Phenergan for nausea. Goodson Dep. 19, 28. Goodson also advised Plaintiff to take Imodium and drink fluids, Goodson Dep. 28; Goodson Notes, which Plaintiff did for two days. Plaintiff Dep. 33.

Goodson wrote Plaintiff a doctor's excuse to remain out of work from August 20, 2009, through August 25, 2009. Certificate for Return to Work or School (attached to Defendants' Motion as Exhibit H). Plaintiff, in turn, gave the excuse to JoEllyn Watson, an employee in Sonoco's human resources department, on August 26, 2009. Plaintiff Dep. 29. This is the only documentation Plaintiff ever submitted regarding his gastroenteritis. Plaintiff Dep. 24-25. The excuse provided

---

[4]In Plaintiff's original Complaint, he alleges that he was diagnosed with PTSD, which constitutes "a disability" as defined by the FMLA. Complaint ¶ 9. The Complaint was subsequently amended to allege that Plaintiff suffered from gastroenteritis rather than PTSD. Amended Complaint ¶ 12. See also Order on Motion for Sanctions filed herewith.

that Plaintiff was under the care of Goodson on August 24, 2009, and excused Plaintiff from work for the period of August 20-25, 2009. Certificate for Return to Work or School. Plaintiff was scheduled to work on August 22, 23, and 24, so those were the only days he missed because he was incapacitated by gastroenteritis. Plaintiff Dep. 48-50; Pl. Response to Def. Interrogatories (attached to Defendants' Motion as Exhibit C).

Plaintiff attempted to return to work on August 26, 2009, when he handed in his doctor's excuse but was told by Watson not to return until the next day, August 27, 2009. Plaintiff Dep. 29, 55. That day McDonald set up a meeting with Senior Regional Human Resources Manager Frank Benson as Plaintiff requested. Plaintiff Dep. 55-56. During that meeting, Plaintiff received two more write-ups. Id. The first write-up was for using his cell phone inside the paper mill. Plaintiff Dep. 56-57. Plaintiff was using his cell phone in the break area, which he had been told in the past was acceptable. Plaintiff Dep. 57. The second write-up documented that Plaintiff would receive a five-day disciplinary layoff as the result of his absence on August 18. Plaintiff Dep. 58. While the August 18 absence was an occurrence, Benson explained to Plaintiff that Sonoco would honor his doctor's excuse and not count the absences on the August 22, 23, and 24 against him. Plaintiff Dep.43.

Following the August 27 meeting, Plaintiff had one occurrence "roll off" (August 23, 2008) leaving him with eight occurrences. Bell Aff. ¶ 4 (attached to Defendants' Motion as Exhibit I).[5] However, he accumulated two more occurrences within a month – he left work early on September 9, 2009 and then was late on September 12, 2009. Id. Plaintiff admits that he left work early on

_____

[5]On September 9, 2009, Jeff Bell took over as mill superintendent. He replaced Moffat as Plaintiff 's second level supervisor. Bell Aff. ¶ 3.

September 9. Plaintiff Dep. 60. However, he denies being late on September 12. Plaintiff Dep. 61.[6]
These additional occurrences put him at ten occurrences for the relevant 12-month period, without
counting the August 22, 23, and 24 absences. Bell Aff. ¶¶ 4, 6. Ten occurrences warranted
termination under Sonoco's attendance policy. Plaintiff Dep. 40-41.

On September 14, 2009, two days after accumulating his tenth attendance occurrence,
Plaintiff got into a verbal confrontation with an employee named Jimmy Gaston on the mill floor.
Plaintiff Dep. 61-62. Plaintiff and Gaston raised their voices in what amounted to a shouting match.
Id. Plaintiff met with McDonald, Bell, and Danny Grant, the Paper Complex Safety Coordinator,
concerning this incident. Plaintiff Dep. 136. Following the meeting, Plaintiff was sent home and
told not to return until he heard from someone at Sonoco. Plaintiff Dep. 136-140. September 14,
2009, was the last day Plaintiff worked at Sonoco. Id.

Bell called Plaintiff asking him to come in for a meeting on September 18, 2009. Plaintiff
Dep. 140. Plaintiff's employment was terminated in that meeting, which Plaintiff, Bell, Robert
Cumbee, the plant manager in Hartsville, and JoEllyn Watson attended. Plaintiff Dep. 63. Bell had
previously recommended that Plaintiff be terminated, and he prepared a Disciplinary Summary
detailing the reasons why. Bell Aff. ¶ 3; Disciplinary Summary (attached to Defendants' Motion as
Exhibit J). Plaintiff's absences on August 22, 23, and 24 were not mentioned on the Disciplinary
Summary and did not factor into Bell's decision to recommend termination. Bell Aff. ¶¶ 3, 6. The
Disciplinary Summary prepared by Bell indicates that the decision to terminate Plaintiff was based
upon his history of "systemic abuse" and "disregard for department policies and procedures."
Disciplinary Summary.   In the meeting, Cumbee told Plaintiff that they had reviewed his

---

[6]Plaintiff also denies being late for work on May 15, 2009, and June 23, 2009. Plaintiff
Dep. 59.

employment records and decided to end his employment.  Plaintiff Dep. 64-65.  Plaintiff's absences

due to gastroenteritis were not discussed.  Plaintiff Dep. 68.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary

judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to

judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Summary judgment is proper if the non-moving party fails to establish an essential element of any

cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.

Once the moving party has brought into question whether there is a genuine dispute for trial on a

material element of the non-moving party's claims, the non-moving party bears the burden of coming

forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita

Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could

reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving

party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may

not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary

judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on

must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."

Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere

allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present

evidence supporting his or her position by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.     DISCUSSION

Plaintiff alleges that Defendant terminated his employment in violation of the FMLA.  The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1).  The FMLA also prohibits an employer from discriminating against an employee for asserting rights under the Act. 29 U.S.C. § 2165(a)(2).  "The FMLA creates two types of claims: (1) interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act; and (2) retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." Gleaton v. Monumental Life Ins. Co., 719 F.Supp.2d 623, 633 n. 3 (D.S.C.2010) (internal citation omitted). In his Response to Defendants' Motion for Summary Judgment, Plaintiff argues that, although he had numerous disciplinary problems, they did not become an issue until after he took FMLA leave. Thus, Plaintiff's claim is one for retaliation under the FMLA.

Retaliation claims under the FMLA are evaluated under the McDonnell Douglas[7] burden-shifting framework.  Perry V. Computer Sciences Corp., 429 Fed.Appx. 218, 221 (4th Cir. 2011).

---

[7]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To establish a prima facie case of retaliation under the FMLA, Plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse action against him, and (3) the adverse action was causally connected to the plaintiff's protected activity.  Yashenko v. Harrah's N.C. Casino Co., LLC, 446 F.3d 541, 551 (4th Cir.2006) (citing Cline v. Wal–Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir.1998)).

Defendants first argue that Plaintiff's gastroenteritis does not qualify as a "serious health condition" as defined under the FMLA.  Although Defendants raise this argument more as a threshold issue rather than as part of a prima facie case of FMLA retaliation, it falls squarely within the protected activity requirement.  "Unless an employee is afflicted with an 'FMLA-qualifying condition'—that is, a 'serious health condition,' he would not have any FMLA rights ... If [plaintiff] lacked a serious medical condition, his leave would not have been 'FMLA' leave, and the adverse actions he alleges would not have stemmed from a protected activity."  Adams v. Wallenstein, 2011 WL 1807787, at *6–7 (D.Md. May 11, 2011).

"The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves--(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  Here, it is undisputed that Plaintiff did not receive inpatient treatment for his gastroenteritis, so the question before the Court is whether he received "continuing treatment by a health care provider."  The FMLA regulations describe what is meant by continuing treatment:

> [a] serious health condition involving continuing treatment by a health care provider
> includes any one or more of the following:
> > (a) Incapacity and treatment. A period of incapacity of more than
> > three consecutive, full calendar days, and any subsequent treatment
> > or period of incapacity relating to the same condition, that also
> > involves:
> > (1) Treatment two or more times, within 30 days of the first day of
> > incapacity, unless extenuating circumstances exist, by a health care

> provider, by a nurse under direct supervision of a health care
> provider, or by a provider of health care services (e.g., physical
> therapist) under orders of, or on referral by, a health care provider; or
> (2) Treatment by a health care provider on at least one occasion,
> which results in a regimen of continuing treatment under the
> supervision of the health care provider.

29 C.F.R. § 825.115(a).[8]

The facts in the record reveal that Plaintiff visited Goodson, a nurse practitioner at Pee Dee Health Care on August 24, 2009, and complained of diarrhea and nausea after eating a sub sandwich. Goodson diagnosed Plaintiff with gastroenteritis and prescribed him Levsin for cramps and Phenergan for nausea. Goodson also advised Plaintiff to take Imodium and drink fluids. Plaintiff took Imodium and drank fluids for two days but did not take the Levsin or Phenergan. He attempted to return to work on August 26, 2009, but was told not to come in until the next day. It is undisputed that Plaintiff was treated only once by a health care provider. Thus, he received continuing treatment from a health care provider only if his visit to Goodson resulted in a "regimen of continuing treatment under the supervision of the health care provider." The regulations provide that

> [a] regimen of continuing treatment includes, for example, a course of prescription
> medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or
> alleviate the health condition (e.g., oxygen). A regimen of continuing treatment that
> includes the taking of over-the-counter medications . . . or bed-rest, drinking fluids,
> exercise, and other similar activities that can be initiated without a visit to a health
> care provider, is not, by itself, sufficient to constitute a regimen of continuing
> treatment for purposes of FMLA leave.

29 C.F.R. § 825.113(c).

Defendant argues that courts have routinely held that gastroenteritis is not a serious health condition. However, the holdings in the cases cited by Defendant are not based solely on the fact

---

[8]Subsections (b)-(e) of 29 C.F.R. § 825.115 list other situations that may be considered continuing treatment by a health care provider. However, those situations are not relevant to this case.

that the plaintiff has gastroenteritis.  For example, in <u>Brannon v. OshKosh B'Gosh, Inc.</u>, 897 F.Supp. 1028, 1037 (M.D.Tenn. 1995), the court held that Plaintiff failed to present proof sufficient to show that she was incapacitated for more than three calendar days, not simply because she had gastroenteritis.  <u>See also</u> <u>Brenneman v. MedCentral Health Sys.</u>, 366 F.3d 412, 427 n.17 (6th Cir. 2004) (finding no serious health condition where doctor prescribed only bed rest and fluids for gastroenteritis); <u>Schmittou v. Wal-Mart Stores, Inc.</u>, No. Civ.011763(JRT/RLE), 2003 WL 22075763, *19 (D.Minn. Aug. 22, 2003) (finding no serious health condition where Plaintiff's daughter was never seen by a medical professional for gastroenteritis); <u>Miller v. AT&T Corp.</u>, 250 F.3d 820, 828 n.6 (4th Cir. 2001) (noting that the plaintiff's care would not constitute a "regimen of continuing treatment" under the FMLA regulations because she was instructed only to rest, take over-the-counter medications and increase her fluid intake).   Here, Plaintiff presented evidence that he was seen by a nurse practitioner who excused him from work for six days and gave him a prescription for two medications.  Thus, these cases cited by Defendant are inapposite.

Plaintiff argues that his gastroenteritis clearly amounts to a serious health condition under the explicit wording of the regulations because he was prescribed two medications.  However, although Plaintiff was prescribed two medications, he testified that he only took an over-the-counter medication, Imodium, and drank lots of fluids.  Thus, Plaintiff's illness falls somewhere between the cases cited by Defendant, where no medication was prescribed, and the wording of the regulations.  Neither party addresses this precise issue, i.e., whether a failure to take prescribed medication is included in the definition of "[t]reatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider."  However, whether Plaintiff had a serious health condition for FMLA purposes turns on this issue.

The court has found two cases addressing the question of whether a plaintiff's treatment,

where he made one visit to a health care professional and was prescribed medication, "result[ed] in a regimen of continuing treatment" absent Plaintiff actually taking the prescribed medication. In D'Amico v. Compass Group USA, Inc., 198 F.Supp.2d 18 (D.Mass.), aff'd, 52 F. App'x 524 (1st Cir.2002), the plaintiff, who had previously complained of depression, fainted on the job and was taken to the hospital where he remained unconscious for four hours. Id. at 20. The attending physician prescribed anti-depressant medication and recommended that the plaintiff take a week away from work. Id. The plaintiff never sought subsequent treatment. Id. at 22–23. The Defendant argued that there was no evidence that the plaintiff ever actually took the prescribed medication. Id. The United States District Court for the District of Massachusetts granted summary judgment on plaintiff's FMLA claims on other grounds, id. at 24, but it first concluded that the plaintiff suffered from a "serious health condition involving continuing treatment by a health care provider" based upon his receipt of prescription medication. Id. at 23. In response to the defendant's argument that no evidence existed that the plaintiff actually took the prescribed medication, the court noted that "a patient's failure to cooperate with a prescribed regimen of care cannot reasonably be perceived to invalidate the doctor's diagnosis that the patient's medical condition is worthy of treatment." Id. The First Circuit affirmed the district court's decision, but stated that it "d[id] not necessarily accept [the district court's] conclusion that appellant met the FMLA threshold requirement[ ] of suffering from a 'serious health condition.'" D'Amico v. Compass Group, USA, Inc., 52 F. App'x 524, 526 (1st Cir.2002).

More recently, the district court for the Northern District of Alabama addressed this issue and, although it acknowledged the district court's finding in D'Amico, noted that the doubt cast by the First Circuit limited the persuasive value of the district court's finding. Burch v. P.J. Cheese, Inc., No. 2:09-cv-1640-SLB, 2013 WL 1281788, *10 (N.D.Ala. March 27, 2013). The Burch court

concluded that the "plaintiff cannot demonstrate that his health condition 'involved continuing treatment by a health care provider' because he did not participate in the 'regimen of continuing treatment' prescribed" for him.  Id. at *11.  In so concluding, the court noted,

> The Secretary of Labor expressed an opinion contrary to the district court in D'Amico in a 1996 Opinion Letter addressing the question, "What if the employee does not have the prescription filled or does not follow the doctor's orders?" DOL Opinion Letter, FMLA–87, 1996 WL 1044784, at *3 (Dec. 12, 1996). The Secretary of Labor adopted the position that "[a]n employee who does not follow the doctor's instructions is probably not under a 'regimen of continuing treatment by or under the supervision of the health care provider' within the meaning of the FMLA regulations." Id.

> The court views the Secretary of Labor's opinion as the sounder interpretation of 29 C.F.R. § 825.114(a)(2)(i)(B)[9] and the plain language of the FMLA. The court reads 29 C.F.R. § 825.114(a)(2)(i)(B) as contemplating that an individual prescribed to "a regimen of continuing treatment" must participate in that "regimen of continuing treatment" to some degree in order to fall within the ambit of the regulation. In other words, treatment by a health care provider only " **results** in a regimen of continuing treatment" when the patient participates in the prescribed "regimen of continuing treatment" to some extent. It strains credulity to hold that the mere placement on or prescription to "a regimen of continuing treatment" transforms a health condition into an FMLA-qualifying "serious health condition **involving continuing treatment** " when no participation in the "regimen of continuing treatment" actually occurs. The opinion in D'Amico appears to conflate the question of whether a health condition "involves continuing treatment" with the question of whether the health care provider believes "continuing treatment" is necessary. Cf. Seidle v. Provident Mut. Life Ins. Co., 871 F.Supp. 238, 246 (E.D.Pa.1994) ("[T]he only issue before this Court is whether the particular [medical condition] ... constitutes a 'serious health condition' as defined legally by the FMLA and its implementing regulations, not as defined by the medical community." (emphasis in original)). Under D'Amico's reasoning, a patient who neglects to attend a scheduled follow-up treatment could theoretically demonstrate "continuing treatment by a health care provider" under 29 C.F.R. § 825.114(a)(2)(i)(A) by showing that his health care provider believed that further in-person treatment was necessary. 29 C.F.R. § 825.114(a)(2)(i)(A) makes clear, however, that the actual receipt of additional treatment is required to demonstrate "continuing treatment" under its provisions. Likewise, the court concludes that the actual participation in the prescribed "regimen of continuing treatment," not the

---

[9]The Burch court appears to be citing to an earlier version of the regulations.  The current version of § 825.114, which became effective March 8, 2013, does not include any subsections and discusses the definition of "inpatient care." Current § 825.115(a)(2), as cited above, contains the "regimen of continuing treatment" language discussed in Burch.

> health care provider's belief that "a regimen of continuing treatment" is necessary, is required to demonstrate "continuing treatment" under 29 C.F.R. § 825.114(a)(2)(i)(B).

Id. at *10-11.

The court finds the reasoning set forth in Burch to be persuasive. Therefore, Plaintiff has failed to show that he suffered from a "serious medical condition" as required by the FMLA because he cannot show that he participated in the "regimen of continuing treatment" prescribed by Goodson. As such, Plaintiff's leave on August 22-24 does not qualify as FMLA leave and, thus, he did not engage in protected activity when he took the leave. Accordingly, Plaintiff fails to present evidence sufficient to establish a prima facie case of retaliation under the FMLA and summary judgment is appropriate.

However, even if Plaintiff's gastroenteritis could be considered a serious health condition, Plaintiff has failed to present sufficient evidence of the third prima facie requirement: a causal connection between his alleged FMLA leave and his termination. Plaintiff argues that he had many disciplinary write-ups prior to his leave on August 22-24 and had no significant disciplinary issues following his leave. Thus, Plaintiff argues, but for him falling ill and missing work, he would not have been terminated. Less than a month passed between Plaintiff's leave on August 22-24, 2009, and his termination on September 18, 2009. Courts have found a sufficient causal connection where an adverse employment action occurred one month after protected activity. See, e.g., Pike v. Osborne, 301 F.3d 182, 185 (4th Cir.2002). However, courts have also held that an intervening legitimate reason to take adverse employment action "dispels an inference of retaliation based upon temporal proximity." Wasek v. Arrow Energy Servs., Inc., 682 F.3d 463, 472 (6th Cir.2012). Here, contrary to Plaintiff's assertion that he had no significant disciplinary issues between his leave for gastroenteritis and his termination, the record clearly establishes that Plaintiff accumulated at least

-14-

one more attendance occurrence when he left work early on September 9, 2009.[10] He also became involved in a verbal altercation with another employee on September 14, 2009, for which he was sent home and told not to return until otherwise notified.  Four days later, Plaintiff's employment was terminated.  Thus, any inference of a causal connection created by the closeness in time between his alleged FMLA leave and his termination is negated by the fact that he engaged in additional termination-worthy conduct following his alleged FMLA leave.

Accordingly, for the reasons discussed above, Plaintiff fails to establish a prima facie case of FMLA retaliation, and summary judgment is appropriate.

## V.     CONCLUSION

For the reasons discussed above, it is recommended that Defendants' Motion for Summary Judgment (Document # 43) be granted and this case be dismissed in its entirety.


                                             s/Thomas E. Rogers, III
                                             Thomas E. Rogers, III
                                             United States Magistrate Judge

May 31, 2013
Florence, South Carolina

---

[10]As noted above, Plaintiff admits to leaving work early on September 9, 2009, but denies arriving to work late on September 12, 2009.  The occurrence he received on September 12, 2009, amounted to his tenth occurrence in a year.  Thus, termination was warranted under Defendant's attendance policy.  However, even if Plaintiff had not received a tenth occurrence, Defendant's attendance policy provides for possible termination for "playing the system" by consistently remaining at the same stage in the occurrence system, see Attendance Policy, an issue that was documented in his Disciplinary Summary.  See Disciplinary Summary (noting that Plaintiff exhibited "a pattern of playing the occurrence system, i.e., soon as [Plaintiff] reaches the thresh hole [sic] of disciplinary lay off or termination for occurrences, his pattern of reporting to work on time changes until an occurrence drops off then he very soon gets another one therefore always staying on the edge of layoff or termination").

-15-